UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| SEAN MIKEL HENRY,<br><br>Plaintiff,<br><br>vs.<br><br>BALFOUR BEATTY COMMUNITIES, LLC,<br><br>Defendant. | 5:24-CV-05075-CCT<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR EXTENSION OF TIME, DENYING DEFENDANT'S MOTION TO STRIKE, AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Sean Mikel Henry brought this pro se lawsuit against his past employer Balfour Beatty Communities, LLC, asserting claims for disability discrimination, harassment, and retaliation under the American with Disabilities Act. Docket 1. For the reasons explained in this order, Henry's claims fail as a matter of law, and Balfour is entitled to summary judgment.

**MOTION FOR EXTENSION OF TIME**

On November 13, 2025, Henry filed a motion requesting additional time to receive discovery responses from Balfour. Docket 19. He filed his motion just one day after the November 12, 2025 deadline for submitting the discovery response. *See id.* Nevertheless, Balfour's response to Henry's motion explains that the parties had agreed in email communications to allow Balfour until November 25, 2025, to respond to Henry's discovery requests. Docket 20; Docket 20-1. Balfour also represented that it would comply with that deadline.

Docket 20 at 2. Henry did not file a reply to Balfour's response, did not dispute Balfour's representation of their agreement, and the November 25 deadline has since passed. Therefore, Henry's motion is denied as moot.

**MOTION TO STRIKE RESPONSE**

Balfour moves, Docket 28, to strike Henry's sur-reply brief, Docket 27, filed in response to Balfour's motion for summary judgment. Alternatively, Balfour requests that the Court disregard the filing. Docket 28 at 1. Balfour notes that neither the local rules nor Federal Rules of Civil Procedure permit the filing of a sur-reply, and further, Henry did not seek leave of the Court to file the sur-reply. *Id.* Henry did not respond to Balfour's motion to strike.

"There is no provision in either the Federal Rules of Civil Procedure or the court's local rules that expressly authorizes the filing of a sur-reply." *Buergofol GmbH v. Omega Liner Co., Inc.*, No. 4:22-CV-04112-KES, 2025 WL 964541, at *2 (D.S.D. Mar. 28, 2025). However, litigants, including pro se litigants, may seek leave for permission to file a sur-reply. *Id.*; *Richmond v. Wiese*, No. 4:25-CV-04217-ECS, 2026 WL 1803076, at *2 (D.S.D. June 23, 2026); *Counts v. Wasko,* No. 4:23-CV-04103-KES, 2024 WL 4068651, at *3 (D.S.D. Sep. 5, 2024). Permission is usually warranted "when the moving party's reply brief contains new information or arguments for which an opportunity to respond is needed." *Counts*, 2024 WL 4068651, at *3 (citation omitted). It is within the court's discretion whether to accept a sur-reply. *Buergofol GmbH*, 2025 WL 964541, at *2.

Henry did not seek leave to file his sur-reply brief. However, Henry's sur-reply responds to Balfour's argument that Henry's responsive brief was untimely and failed to comply with the local rules governing responses to motions for summary judgment. *See generally* Docket 27; *see also* Docket 25 at 2–3. Given Henry's pro se status and that Balfour's reply contains a new argument, the Court would have granted leave for Henry to file a sur-reply brief had he requested it. Therefore, the Court exercises its discretion to accept Henry's sur-reply, and Balfour's motion to strike is denied.

**MOTION FOR SUMMARY JUDGMENT**

## I. Background

Balfour hired Henry as a Maintenance Technician 1 in late March 2023. Docket 23 ¶ 1; Docket 24-2 at 21. He claims that beginning in May 2023, he started experiencing harassment from his coworkers and later by a manager named Tim Ehlers. Docket 1 at 3. According to Henry,

> I was still learning my job as a housing maintenance employee at [Balfour] and so was frequently asking for policy clarification from my coworkers and supervisors. I noticed Amber [a coworker] refusing to schedule work orders that were already started and needed to be finished. Instead, she kept scheduling new ones, claiming that "new work orders were more important for numbers". I never had time to complete open work orders due to this over-scheduling. When I asked Dennis [a supervisor] how to handle this, he said to "go back to them when I had time". I noticed also that Sylvia [a coworker] would get scheduled the easier, faster orders to complete. The Balfour Housing office employee(s) conducted an audit on the workorders proving this to be true. Amber willfully ignored this discrepency [sic] and aggressively disputed any favoritism towards Sylvia and against myself. She also refused to give me fewer new orders. I then tried to adhere to Amber and Dennis' workorder policy by focusing only on the orders assigned me. This led to a pile-up of unfinished orders behind me, growing

> daily. I would bring up these obvious policy issues with Amber and Dennis frequently, only to be scoffed at and dismissed.

*Id.*

Henry further alleges that "[t]hings began to grow out of control in June of 2023." *Id.* at 5. He was injured at work and went to the emergency room. *Id.* He returned to work and was confronted by a coworker named Shawn Rhoden, who, according to Henry, was upset about having to finish Henry's work orders. *Id.* Henry claims that he did not respond to Shawn and instead went to speak with Dennis about his discharge from the emergency room. *Id.* Henry relates that Dennis requested that he complete certain paperwork before going home, and while he was doing so in a breakroom, Shawn confronted him and challenged him to a physical fight outside. *Id.* Henry did not fight Shawn but, rather, asked him to remain calm. *Id.* At first Henry did not know why Shawn threatened him, but he testified that he later came to believe it was because Shawn thought Henry's slower speed at completing work orders could affect team bonuses. Docket 24-2 at 26–27.

Henry reported Shawn's threat and conduct to Community Manager Katie Weisz. Docket 1 at 5. During his deposition, Henry agreed that Katie addressed the threat by Shawn shortly after it was reported. Docket 24-2 at 18–19. She notified Jonathan Nix from human resources, and Jonathan communicated with Henry about the incident. *Id.* at 18. Jonathan also investigated the matter and issued a warning to Shawn. Docket 23 ¶ 9; Docket 24-3 at ¶¶ 6–8.

According to Henry, his coworkers continued to harass him, and in September 2023, when Tim was Henry's maintenance manager, "the proverbial stuff hit the fan[.]" Docket 24-2 at 13–15. Henry contends that he was harassed because he reported Shawn's behavior. Docket 1 at 5. He also claims that "Amber was spreading rumors that we [employees] would lose our bonus because [Henry] 'wasn't doing [his] job properly'." *Id.* According to Henry, "[t]his also led to Tim repeatedly acting unprofessional and retaliating against [him]." *Id.* He also claims that "Tim repeatedly confronted [him] for talking to Dennis and Katie about his unprofessional behaviors." *Id.*

At a work meeting convened to discuss the personnel issues, Henry felt that his coworkers and Tim "made it clear . . . that 'nobody trusts [him] or likes [him] or wants to work with [him]' because [he] 'turn[s] people in for harassment'." *Id.*; Docket 24-2 at 23, 28. Henry also contends that after this work meeting, there were multiple instances "where Tim retaliated against [him] with either false accusations or verbal harassment[,]" and there was one incident where a coworker named Sylvia harassed him. Docket 1 at 5. Henry testified that he believed his coworkers treated him poorly at first because they thought he was not working fast enough, and then "they got mad that [he] turned them in for misbehaving or however you want to say it." Docket 24-2 at 25.

In October 2023, Henry submitted a complaint via a third-party hotline, alleging mistreatment and misrepresentations by Tim. Docket 23 ¶ 11; Docket 24-2 at 29. He admitted during his deposition that Balfour investigated and

tried to resolve his complaint. Docket 24-2 at 3, 14; Docket 23 ¶ 16. According to Balfour, Jonathan's investigation revealed that Tim had "engaged in inappropriate, but not harassing, conduct[.]" Docket 22 at 9. Balfour further asserts that as a result of the investigation, Tim received "an escalated written warning—issued despite his lack of prior discipline—and mandatory management and communication training." *Id.*; Docket 24-3.

On November 20, 2023, Henry filed a second complaint, and Balfour initiated an investigation. Docket 23 ¶¶ 18, 20; Docket 24-3 ¶ 13. Balfour claims that on November 21, 2023, Jonathan and Katie met with Henry about this complaint, and during that meeting Henry abruptly left. Docket 24-3 ¶ 14. Henry disputes that he left abruptly or that he had met with Jonathan in person, although it is unclear from his response whether he disagrees that he attended an in-person meeting with Katie. Docket 25 at 3. Regardless, it is undisputed that Henry did not return to work at Balfour after November 21. Docket 24-2 at 30.

Henry sent an email on November 27, 2023, with additional information about his complaint, and Jonathan responded to the email requesting that Henry meet with him to discuss his concerns. Docket 23 ¶ 21; Docket 22 at 10. Henry sent a reply email explaining why he had gotten frustrated in the meeting. Docket 24-9. In his deposition and in his response to discovery, Henry explained that he had requested to be reassigned to a different manager and "removed from the people who were causing [him] the stress and harassment or harassing [him]," but Balfour refused that accommodation for him. Docket 24-

2 at 5–6, 21–22; Docket 24-10. Henry also testified that he would have returned to work at Balfour had Tim been removed as his manager even if Shawn and Amber remained as his coworkers. Docket 24-2 at 22.

According to Henry, because Balfour denied his accommodation request (that Tim be removed as his manager), he felt forced to leave his employment. *Id.* at 5–6, 22; Docket 23 ¶ 24. He informed Balfour of this in his November 27, 2023 email, where he stated that he had "no option but to follow through on a Constructive Dismissal." Docket 24-9. Henry's last official day of employment by Balfour was December 4, 2023. Docket 1 at 5.

On October 3, 2024, Henry filed this pro se lawsuit against Balfour under the American with Disabilities Act (ADA) for "unlawful retaliation and discrimination against ability." Docket 1 at 6. He also checked the box for the Fair Labor Standards Act (FLSA), and his complaint mentions Title VII of the Civil Rights Act of 1964. *Id.* Balfour moves for summary judgment, requesting dismissal of Henry's lawsuit in its entirety. Docket 21.

## II. Procedural Matters

Balfour claims entitlement to summary judgment based on the fact Henry failed to timely file his response to the motion for summary judgment. Docket 26 at 2. Henry responds that he "was not reminded by either [the Court or Balfour] that [he] had a set time period to respond." Docket 27 at 1. He emphasizes that he dropped out of high school and has no formal educational or professional legal experience. *Id.* at 2. Nevertheless, he apologizes for the late reply, claiming that he believed he had 30 days to respond. *Id.*

Contrary to Henry's view, he was informed of the deadline within which to file his response to Balfour's motion for summary judgment. On March 20, 2025, the Court issued a scheduling order setting forth that when a motion is filed, the opposing party "must file and serve any answering materials and briefs within twenty-one days." Docket 14 at 3. To be sure, pro se litigants are expected to familiarize themselves with the procedural rules. *Winston v. Kelly*, 586 F. App'x 683, 684 (8th Cir. 2014). Nevertheless, given Henry's pro se status and that his responsive brief was filed only six days after the deadline, the Court exercises its discretion to accept his late response to Balfour's motion for summary judgment. *See Braxton v. Bi-State Dev. Agency*, 728 F.2d 1105, 1107 (8th Cir. 1984) ("It is for the district court to determine what departures from its rules may be overlooked.").

Balfour next claims that all material facts should be deemed admitted because Henry failed to comply with D.S.D. Civ. LR 56.1(B), which required him to "respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record" and to identify material facts genuinely in dispute. Docket 26 at 2. Balfour also notes that Henry did not submit an affidavit, declaration, or other admissible evidence supporting his claims as required by Civil Local Rule 56.1(C). *Id.* at 2–3.

Henry argues that he did not know how to appropriately write a response to Balfour's motion for summary judgment and that he did not admit said facts alleged by Balfour. Docket 27 at 2. He also takes issue with Balfour "cherry-

pick[ing] quotes taken out-of-context from the deposition" and for filing its motion and statement of undisputed material facts without first conferring with him. *Id.* at 1. In his view, Balfour should have provided him an "opportunity to agree or disagree with [Balfour's] stipulation of facts and/or evidence before their filing of motions." *Id.* at 2.

Henry's blame is misplaced. The Clerk of Court provided Henry a copy of the District of South Dakota's Civil Local Rules of Practice and Federal Rules of Civil Procedure 26, 33, 34, 36, 37, and 56. Docket 18. These rules set forth how he was to respond to a motion for summary judgment and to Balfour's statement of undisputed material facts, and Henry was expected to familiarize himself with these rules. *See Winston*, 586 F. App'x at 684. Henry's "'pro se status did not entitle him to disregard the Federal Rules of Civil Procedure,' even without affirmative notice of the application of the rules to his case." *See Bennett v. Dr Pepper/Seven Up, Inc.*, 295 F.3d 805, 808 (8th Cir. 2002) (citation omitted).

Nevertheless, the Court declines to deem Balfour's statement of undisputed material facts admitted. Although Henry's response does not comply with Civil Local Rule 56.1, Henry referred to the numbered paragraphs from Balfour's statement of undisputed material facts and either agreed that such fact is undisputed or otherwise argued why such fact remains in dispute. *See, e.g.*, Docket 25 ("It is not in dispute that I was harassed by my coworkers for 'not completing my work orders fast enough' (5, 6)"; "One thing I will contest is point 19[.]"). Therefore, the Court construes Henry's statements in his

responsive brief as responsive to Balfour's statement of undisputed material facts. *See Rinehart v. Weitzell*, 964 F.3d 684, 687 (8th Cir. 2020) (explaining that submissions by pro se litigants must be construed liberally and given broad interpretation).

### III. Summary Judgment Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). '"The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law." *NDN Collective v. Retsel Corp.*, 5:22-CV-5027, 2024 WL 3903975, at *2 (D.S.D. Aug. 22, 2024) (citations omitted). "The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence sufficient to support an element of its case on which it bears the ultimate burden of proof." *Id.* (citation omitted).

"Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must present facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *S. Black Hills Water Sys., Inc. v. Town of Hermosa*, 5:21-CV-05070-VLD, 2023 WL 4824956, at *4 (D.S.D. July 27, 2023) (citations omitted). The Court will "review the evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party." *Musolf v. J.C. Penney Co., Inc.*, 773 F.3d 916, 918 (8th Cir. 2014) (citation omitted).

## IV. Discussion

### a. ADA Harassment Claim

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The phrase "terms, conditions, and privileges of employment" has been interpreted to prohibit workplace harassment. *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 720 (8th Cir. 2003). "To prevail on a hostile work environment claim under the ADA," the plaintiff "must show 'that he is a member of the class of people protected by the statute, that he was subject to unwelcome harassment, that the harassment resulted from his membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of his employment.'" *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 778 (8th Cir. 2012) (quoting *Shaver*, 350 F.3d at 720).

Although the record does not set forth Henry's disability, the Court assumes Henry belongs to a protected group due to a disability. However, Henry has not shown that he was harassed because of his disability. He testified that the more often he was treated poorly, "the more pain and stuff [he] would be in; which ultimately just leads to [him] missing more work, because [he is] getting stressed out." Docket 24-2 at 35. He also explained that his accommodation request—remove Tim from being his supervisor—was to make his work less stressful for him and to allow him to continue working. Docket 25 at 2. At most, Henry has shown that the alleged harassment caused

increased stress and in turn made his disability worse. This does not meet the standard for showing that he "was singled out because of [his] disability." *Lenzen v. Workers Comp. Reinsurance Ass'n*, 705 F.3d 816, 822 (8th Cir. 2013).

Henry also has not shown that the alleged harassment, assuming it was because of his disability, was "sufficiently 'severe or pervasive' to affect a term, condition, or privilege of the plaintiff's employment." *See Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 634 (8th Cir. 2016) (citation omitted). "[T]he harassment standards are 'demanding.'" *Id.* (quoting *Arraleh v. Cty. of Ramsey,* 461 F.3d 967, 979 (8th Cir. 2006)). Therefore, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Arraleh*, 461 F.3d at 979 (alteration and citation omitted). Also, "'[m]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment' to support a claim of hostile work environment." *Id.* (citation omitted). Henry alleges workplace friction, name calling, and one workplace hostile verbal exchange that was addressed by Balfour—conduct that is neither severe nor pervasive.

Because Henry has not shown that he was harassed because of his disability or that he faced a hostile work environment, his harassment claim under the ADA fails, and Balfour is entitled to summary judgment on this claim.

**b. ADA Discrimination and Retaliation Claims**

"The ADA prohibits employers from discriminating against employees on the basis of disability" and "from retaliating against employees for engaging in a statutorily protected activity, which includes requesting an accommodation." *Anderson v. KAR Global*, 78 F.4th 1031, 1036 (8th Cir. 2023) (citing 42 U.S.C. §§ 12112(a), 12203(a)). Henry identifies no direct evidence of discrimination or retaliation; therefore, his claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under this framework, the employee has the burden of establishing a prima facie case. *Id.* "To establish a prima facie case of discrimination, [a plaintiff] 'must demonstrate that (1) he is a disabled person as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability.'" *Id.* (quoting *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019)). To make a prima facie showing of retaliation, the plaintiff must "show (1) [he] engaged in statutorily protected activity; (2) [he] suffered an adverse employment action; and (3) a causal connection between the two." *Id.* (alteration in original) (quoting *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 924 (8th Cir. 2018)).

If the plaintiff makes the prima facie showing, "[the] burden of establishing a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse

employment action." *Grant v. City of Blytheville*, 841 F.3d 767, 773 (8th Cir. 2016) (alteration in original). Then, if the employer meets its burden of production, the burden shifts back to the employee "to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citation omitted).

Here, the Court first addresses whether Henry has shown that he suffered an adverse employment action. Henry's discrimination and retaliation claims are premised on his belief that he was constructively discharged. Indeed, he does not claim that he suffered any other adverse employment action. *See, e.g., Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024) (explaining that "[a]n adverse employment action is a disadvantageous change to the compensation, terms, conditions, or privileges of employment").

"A constructive discharge occurs 'when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job.'" *Thompson v. Bi-State Dev. Agency*, 463 F.3d 821, 825 (8th Cir. 2006) (quoting *Smith v. World Ins. Co.,* 38 F.3d 1456, 1460 (8th Cir. 1994)). "A constructive discharge takes place only when a reasonable person would find working conditions intolerable." *Id.* Therefore, an employee's subjective belief that the working conditions are intolerable is not the standard. *Id.* Further, "[c]onstructive discharge requires considerably more proof than an unpleasant

and unprofessional environment." *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002).

The evidence in the record viewed in a light most favorable to Henry shows that his supervisor Tim and certain coworkers mistreated him. But Henry made clear that he would have continued to work at Balfour with the coworkers that harassed him; he only wanted Tim removed as his supervisor. Docket 24-2 at 8–9. Therefore, when considering his constructive discharge claim, the Court focuses on Henry's argument that he was constructively discharged because Balfour declined his request to remove Tim as his supervisor when Tim continued to mistreat him after being disciplined in response to Henry's first third-party complaint.

When explaining why he felt forced to quit, Henry stated,

> I can't say the mens rea of the managers or whatever, why they did or didn't do whatever, but I just felt like the remedies they were coming up with or not coming up with or implementing or not implementing, just wasn't working.
>
> I felt, in the beginning, I was very patient and very willing to let them do whatever. Like I said earlier when I was asked, "What do you want to happen? What do you think should happen?" I'm not their manager. I'm not trying to run this place or make demands of people or be a Karen. I'm trying to be rational here.
>
> Sometimes people can have a bad day and they can lash out. Things can happen. I'm pretty reasonable. You get mad, yell at me. You come back and say, "Hey, man. I'm sorry." I'll let it go.
>
> When things continue to happen over and over and over, I think in one of the E-mails I even made the example to Jonathan of, if somebody comes and they're punching you in the face every day and then management talks to them and then they don't punch you in the face for a day, but the next day they punch you in the face and it's every other day they punch you in the face, you're not getting punched in the face every day.
>
> So like in one aspect it's better, but is that actually fixing the problem? Is that resolving the issue? In my mind, it's not.

*Id.* at 15–16.

"An employee claiming constructive discharge shoulders a substantial burden." *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 826 (8th Cir. 2017). Therefore, when an employee quits without giving his "employer a reasonable chance to work out a problem[,]" that employee "has not been constructively discharged." *Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1144 (8th Cir. 2007) (citation omitted). Further, "[a] reasonable employee has 'an obligation not to assume the worst and not to jump to conclusions too quickly.'" *Id.* (citation omitted).

Here, the record establishes that Henry assumed the worst—that Tim would always be a problem—and then did not give Balfour a reasonable chance to work out the issue before he quit. *See id.* (observing that the employer was investigating the issue and proposing solutions when the employee resigned); *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 842 (8th Cir. 1998) (holding that an employer is not liable for constructive discharge if the employee quits without allowing the employer to resolve the problem). The record further establishes that Henry voluntarily quit because Balfour rejected his proposed solution—that Tim be removed from supervisory authority over him—not because Balfour's actions left him with no other recourse than resignation. *See Tork v. St. Luke's Hosp.*, 181 F.3d 918, 919–20 (8th Cir. 1999) (finding no constructive discharge in part because "it would not have been reasonable for [the plaintiff] to believe she was without recourse" when she quit without giving the employer a reasonable chance to resolve the issue).

On this record, Henry has not shown that he was constructively discharged. Therefore, he has failed to establish an essential element of his prima facie case of discrimination or retaliation under the ADA, and Balfour is entitled to summary judgment on these claims.

However, even if Henry could establish each element necessary for a prima facie showing of discrimination or retaliation, his claims would nevertheless fail as a matter of law because Balfour articulated a legitimate, non-discriminatory and non-retaliatory reason for denying his request that Tim no longer be his supervisor. In an affidavit, Jonathan attested that he informed Henry that Balfour "was unable to reorganize the department to accommodate his request for a new manager because it would cause financial and administrative hardship to the business to hire a new manager given the specialized nature of the Maintenance Manager position." Docket 24-3 at 4–5. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Anderson*, 78 F.4th at 1038 (quoting *Floyd v. Mo. Dep't of Soc. Servs., Div. of Fam. Servs.*, 188 F.3d 932, 936 (8th Cir. 1999)). While Henry disagrees with Balfour's decision to retain Tim, Henry has not argued or shown that Balfour's stated reason was pretextual for discrimination.

**c. FLSA and Title VII Claims**

Henry's FLSA claim, to the extent he asserts one, fails as a matter of law because he has not alleged facts that bring his allegations within the Act's scope. The FLSA establishes minimum standards for wages, hours, and

employment conditions to safeguard workers from unfair labor practices. *See* 29 U.S.C. §§ 201–219; *see also Kasten v. Saint-Gobain Perf. Plastics Corp.*, 563 U.S. 1, 4 (2011). Yet, nothing in Henry's complaint or filings relates to conduct regulated by the FLSA or to protected-status requirements.

Henry's Title VII claim also fails because he has not shown that he exhausted his administrative remedies. *See Lindeman v. Saint Luke's Hosp. of Kan. City,* 899 F.3d 603, 608 (8th Cir. 2018) (exhaustion is mandatory). However, even if Henry could show that he exhausted his administrative remedies, Balfour has nonetheless shown entitlement to summary judgment because there is nothing in the record supporting that the conduct challenged by Henry involved any of the characteristics protected by Title VII. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) ("Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" (quoting 42 U.S.C. § 2000e-2(a)(1)).

**CONCLUSION**

For the reasons stated above, it is hereby

ORDERED that Henry's motion for extension of time, Docket 19, is denied as moot. It is further

ORDERED that Balfour's motion to strike, Docket 28, is denied. It is further

ORDERED that Balfour's motion for summary judgement, Docket 21, is granted. It is further

ORDERED that Henry's complaint, Docket 1, is dismissed with prejudice.

Dated August 20, 2026.

BY THE COURT:

/s/ *Camela C. Theeler*
CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE